IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

TIMOTHY DOUGLAS                                                    PLAINTIFF


        v.                                CIVIL NO. 19-2037


ANDREW M. SAUL, Commissioner
Social Security Administration                                    DEFENDANT


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Timothy Douglas, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed his current applications for DIB and SSI on August 25, 2016, alleging an inability to work since July 26, 2015, due to depression, a left torn rotator cuff and arthritis.  (Tr. 58, 198, 205).  For DIB purposes, Plaintiff maintained insured status through December 31, 2017.  (Tr. 15, 212).  An administrative hearing was held on April 10, 2018, at which Plaintiff appeared with counsel and testified. (Tr. 37-54).

By written decision dated May 14, 2018, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 17).

1

Specifically, the ALJ found Plaintiff had the following severe impairments: a disorder of the left knee, osteoarthritis, a disorder of the left shoulder, anxiety and an affective disorder. However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 18). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally stoop, crouch and reach overhead with his non-dominant left upper extremity. He is limited to simple, routine, repetitive tasks in a setting where interpersonal contact is incidental to the work performed. The claimant can respond to supervision that is simple, direct and concrete.

(Tr. 19). With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a can-filling closing machine tender, a power screwdriver operator, and a compression molding machine tender. (Tr. 28).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on January 10, 2019. (Tr. 1-6). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Docs. 12, 13).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the time of the administrative hearing held before the ALJ on April 10, 2018, Plaintiff, who was fifty years of age, testified that he had obtained a general equivalency

diploma.  (Tr. 40).  The record reflects Plaintiff's past relevant work consists of work as a gear shaper setup machine operator.  (Tr. 50).

The pertinent medical evidence for the time period in question reflects the following. On July 29, 2015, Plaintiff was seen in the Schmitz Family Practice for a medication refill. (Tr. 458-459).  Plaintiff reported he was satisfied with his current medication and was not experiencing side effects.  Dr. Schmitz noted Plaintiff had intact memory; normal judgment, insight and mood; and normal speech rate and tone.  Plaintiff was assessed with anxiety and depression and his medication was refilled.

On September 18, 2015, Plaintiff was seen in the Schmitz Family Practice for left shoulder pain.  (Tr. 455-457).  Plaintiff reported he had started working out by doing push-ups and noticed a popping and crackling sound in his shoulder.  Plaintiff also felt pain with abduction over eighty degrees.  Dr. Schmitz noted Plaintiff had an old shoulder injury from years ago from construction work that required a lot of lifting.  After examining Plaintiff, Dr. Schmitz assessed Plaintiff with shoulder joint pain and ordered x-rays of the shoulder.  The x-rays revealed mild degenerative hypertrophic arthropathy of the acromioclavicular joint and left uncovertebral spurring at C5-6. (Tr. 324).

On September 23, 2015, Plaintiff was seen in the Schmitz Family Practice for a follow-up for his left shoulder pain.  (Tr. 452-454).  Dr. Schmitz noted the Medrol dose pack did not improve Plaintiff's pain.  Plaintiff reported he continued to experience pain and felt grinding with movement.  After examining Plaintiff, Dr. Schmitz assessed Plaintiff with subacromial bursitis.  Plaintiff received a steroid injection and medication refill.  Dr. Schmitz noted he would consider referring Plaintiff to an orthopedic specialist if there was no improvement.

On September 28, 2015, Plaintiff was seen in the Schmitz Family Practice for a follow-up regarding his left shoulder pain. (Tr. 449-451). Plaintiff reported the steroid shot helped for a few days but the pain returned after he used a weed-eater. Plaintiff reported his pain radiated up to his neck and down his arm. Tramadol did not help. Upon examination, Dr. Schmitz assessed Plaintiff with shoulder joint pain and prescribed medication and referred him to an orthopedic specialist.

On October 20, 2015, Plaintiff was seen by Dr. Trent Johnson for a several month history of left shoulder pain. (Tr. 347-349). Plaintiff reported he was lifting weights while working out and felt a pop in his left shoulder followed by an acute onset of pain. Plaintiff reported medication provided only mild relief. Plaintiff indicated he experienced stiffness and pain with activities. Plaintiff reported he had been unable to work since the incident. Dr. Johnson diagnosed Plaintiff with a left shoulder rotator cuff sprain and scheduled a MRI.

On October 22, 2015, Plaintiff was seen in the Schmitz Family Clinic for a three month hypertension check. (Tr. 446-448). Plaintiff reported his medication was giving him a headache so he wished to change medication. Plaintiff also reported experiencing shortness of breath and wanted to talk about a weight loss medication. Plaintiff reported he continued to smoke. After examining Plaintiff, Dr. Schmitz assessed Plaintiff with hypertension, hyperlipidemia, weight gain, edema of the leg, fatigue and male hypogonadism. Plaintiff was prescribed medication and asked to follow-up in six weeks.

On November 10, 2015, Plaintiff returned to Dr. Johnson for a follow-up regarding his left shoulder. (Tr. 326, 350-352, 566-567). Dr. Johnson noted Plaintiff continued with aching and throbbing in his left shoulder. Dr. Johnson noted Plaintiff's MRI revealed a possible bursal-sided tear of his rotator cuff but no full thickness deficit, a significant amount

4

of fluid inflammation around the biceps tendon and a mild degree of degenerative changes of the AC joint. Dr. Johnson recommended a corticosteroid injection which was done at the appointment and physical therapy.

On November 12, 2015, Plaintiff was seen in the Schmitz Family Clinic for a follow-up for his hypertension and hyperlipidemia. (Tr. 443-445). Plaintiff complained of insomnia and asked for a medication to help him sleep. After examining Plaintiff, Dr. Schmitz assessed Plaintiff with hypertension, insomnia, dietary surveillance and counseling and exercise counseling. Plaintiff was prescribed medication and asked to return in one month.

On November 25, 2015, Plaintiff was seen in the Schmitz Family Clinic complaining of lumbago. (Tr. 439-442). Plaintiff complained of back pain after lifting. Plaintiff also reported having an itchy throat. Dr. Schmitz assessed Plaintiff with acute sinusitis and back pain. Plaintiff was prescribed medication.

On December 11, 2015, Plaintiff was seen by Dr. Johnson for a follow-up for his left shoulder pain. (Tr. 353-355). Plaintiff reported the injection provided significant relief of his pain and symptoms. Plaintiff reported he was put on a home therapy program which had provided some improvement with strength. Plaintiff reported pain with activities, particularly overhead activity and lifting. After examining Plaintiff, Dr. Johnson recommended and treated Plaintiff with another injection.

On February 2, 2016, Plaintiff was seen in the Schmitz Family Practice for medication refills and head congestion. (Tr. 327, 436-438). Dr. Schmitz noted Plaintiff's report of a head cold for the past four weeks. Plaintiff indicated he used leftover Augmentin that did not help. Plaintiff also requested a referral to an orthopedic specialist for his hip pain. Dr. Schmitz noted Plaintiff also wanted his lungs checked as he was a smoker and had

a family history of lung disease. Plaintiff underwent a chest x-ray that revealed no active cardiac or pulmonary disease. After examining Plaintiff, Dr. Schmitz assessed Plaintiff with an upper respiratory infection, pain in the right hip and tobacco use.

On February 25, 2016, Plaintiff was seen by Dr. Johnson for left shoulder pain and right hip pain. (Tr. 356-359). With respect to Plaintiff's left shoulder, Dr. Johnson discussed nonsurgical and surgical options. Plaintiff elected surgical intervention. With respect to Plaintiff's right hip, Plaintiff received an injection and was started on IT band stretching and a home exercise program.

On February 26, 2016, Plaintiff was seen by Dr. Johnson for left shoulder pain. (Tr. 340-342). Dr. Johnson noted Plaintiff had bicipital tenosynovitis, as well as, a possible partial-thickness tear of his rotator cuff that had been treated nonoperatively. Plaintiff reported maximal relief of pain associated with injections, but the pain returned. Plaintiff reported a marked degree of pain in his left shoulder that radiated down to his elbow. Plaintiff reported the pain was worse when he performed heavy lifting and reaching. After examining Plaintiff and discussing his options, Dr. Johnson noted Plaintiff elected to undergo surgical repair. Plaintiff underwent a left shoulder arthroscopy on March 2, 2016. (Tr. 343-344, 568-576).

On March 17, 2016, Plaintiff was seen by Dr. Johnson for a follow-up for his left shoulder, status post left shoulder arthroscopy. (Tr. 360-362). Plaintiff reported that overall he was doing okay but still needed pain medication. Plaintiff reported the left hip pain was unchanged. Plaintiff was instructed to continue with sling wear, gentle pendulums and passive range of motion with wall climbs in the forward plane.

On April 8, 2016, Plaintiff was seen by Dr. Johnson for a follow-up for his left shoulder. (Tr. 363-365). Plaintiff reported that overall he was doing well. Plaintiff reported he had experienced a mild twinge of pain after his son grabbed his arm by accident. Plaintiff reported compliance with sling wear, as well as, lifting and activity restrictions. Dr. Johnson recommended Plaintiff continue with the sling for another week. Plaintiff was referred to physical therapy.

On April 29, 2016, Plaintiff was seen by Dr. Johnson for a follow-up for his left shoulder. (Tr. 366-367). Dr. Johnson noted Plaintiff had been in therapy and was working on range of motion and strengthening exercises. Plaintiff reported he continued to have aching and throbbing of the shoulder and was taking pain medication. After examining Plaintiff, Dr. Johnson recommended discontinuing the use of the sling and continuing physical therapy.

On May 26, 2016, Plaintiff was seen by Dr. Johnson. (Tr. 333-334). Plaintiff reported he ran out of pain medicine approximately one week ago which resulted in a worsening of his shoulder pain. After examining Plaintiff, Dr. Johnson recommended Plaintiff resume physical therapy. Plaintiff was also instructed to continue with ice and oral anti-inflammatories. Plaintiff also received a pain medication refill. Plaintiff was to return in three weeks.

On June 21, 2016, Plaintiff was seen in the Schmitz Family Practice for a medication refill. (Tr. 432-435). Plaintiff complained of left shoulder pain. Dr. Schmitz noted that the injury occurred when Plaintiff was lifting a rear end of a truck. Upon examination, Dr. Schmitz noted Plaintiff's extremities exhibited no deformities, clubbing, cyanosis or edema. Plaintiff was noted to have intact memory and normal judgment, insight, mood and affect.

Plaintiff's gait was within normal limits. Plaintiff was given a medication refill and referred to Dr. Johnson for an evaluation of the shoulder.

On June 23, 2016, Plaintiff was seen for a follow-up for his left shoulder. (Tr. 335-337). Dr. Johnson noted Plaintiff had returned to work in construction. Plaintiff denied any significant stiffness in his shoulder but reported soreness with repetitive motion and activities. Plaintiff reported his need for narcotics had decreased. After examining Plaintiff, Dr. Johnson noted Plaintiff continued with some degree of tendinosis of the supraspinatus and infraspinatus. Dr. Johnson noted Plaintiff had not completely rehabbed the shoulder. Dr. Johnson recommended Plaintiff attend physical therapy and use nonsteroidal anti-inflammatories. Plaintiff was to return in six weeks.

On July 6, 2016, Plaintiff was seen in the Schmitz Family Practice for a pain medication refill. (Tr. 430-431). Dr. Schmitz noted Plaintiff was seen by an orthopedic specialist for his hip pain. Plaintiff reported he was told he might need a replacement in the next four years. Plaintiff requested something for pain until he could see the orthopedic specialist. Plaintiff's gait was noted as within normal limits. Plaintiff was assessed with right hip pain. Dr. Schmitz refilled Plaintiff's medication and discussed consulting pain management.

On July 15, 2016, Plaintiff was seen by Dr. Johnson for an evaluation of his right hip. (Tr. 338-340). Dr. Johnson noted Plaintiff had a history of an IM nail of the right femur that was later removed. Plaintiff reported continued aching and throbbing for several years. Plaintiff reported pain when he laid on his right side. Dr. Johnson noted Plaintiff had some baseline weakness with his hip girdle on the right. Plaintiff reported the pain had increased with his weight gain. Plaintiff also reported chronic back pain. After examining Plaintiff,

Dr. Johnson assessed Plaintiff with right hip greater trochanteric bursitis. Plaintiff received a right hip injection and was instructed to ice and rest the hip for the next forty-eight to seventy-two hours.

On August 16, 2016, Plaintiff was seen in the Schmitz Family Practice for treatment of his anxiety. (Tr. 427-429). Plaintiff reported he was on medication but continued to have mood swings. Plaintiff indicated he had not seen a mental health provider for about two years. Plaintiff also requested pain medication or a pain management referral for hip and back pain. Plaintiff reported Dr. Johnson had given him a shot and said he would need to wait two months for surgery. Dr. Johnson also told Plaintiff he would not prescribe any more pain medication until the surgery. Plaintiff reported he had started a new job. Upon examination, Dr. Schmitz noted Plaintiff experienced pain with range of motion of the hip and grimaced in pain with internal and external rotation. Plaintiff was noted to walk with a limp. Plaintiff exhibited a normal appearance, slow speech, intact memory and an anxious depressed mood. Plaintiff was assessed with pain in his hip, low back pain and depression with anxiety. Dr. Schmitz prescribed medication and recommended Plaintiff start counseling. Plaintiff was also referred to pain management.

On August 29, 2016, Plaintiff was seen in the Schmitz Family Practice for a follow-up for his depression and anxiety. (Tr. 425-426). Plaintiff reported he could not stand to be around people and was not sleeping. Plaintiff indicated he was sent home from work. Plaintiff exhibited a gait within normal limits. After examining Plaintiff, Dr. Schmitz assessed Plaintiff with depression with anxiety and prescribed medication. Dr. Schmitz advised Plaintiff to establish care with a mental health professional.

On August 31, 2016, Plaintiff presented to The BridgeWay with complaints of a depressed and irritable mood. (Tr. 374-382). Plaintiff reported he had been secluding himself and felt no purpose in life. Plaintiff reported he was living with his girlfriend. Plaintiff was admitted and started on medication. On September 2nd, Plaintiff stated he mainly came to the hospital because he had concerns that he might develop side effects from the recent dosage increase of Celexa by his primary care physician. Plaintiff was discharged on September 3rd, due to showing objective signs of improvement.

On September 9, 2016, Plaintiff was seen in the Schmitz Family Practice for an office visit and medication refill. (Tr. 422-424). Dr. Schmitz noted Plaintiff went to "psych/inpatient" and had his medication adjusted. Plaintiff reported he was doing better. Plaintiff reported he had a pain management appointment in October but needed a medication refill until this appointment. Plaintiff complained of low back and hip pain. Dr. Schmitz also noted Plaintiff had seen an orthopedic specialist that had discussed hip surgery. Plaintiff reported that he smoked every day but rarely drank alcohol. Plaintiff was noted to have a normal appearance and mood and intact memory. Plaintiff was assessed with depression and chronic low back pain.

On September 12, 2016, Plaintiff was seen at Western Arkansas Counseling and Guidance Center for a diagnostic evaluation. (Tr. 388-395, 407-413). Plaintiff was seeking help for depression. Plaintiff reported he was living with his girlfriend. Ronnie Goff, LPE, noted Plaintiff was abusing alcohol. However, Plaintiff was adamant that he did not need drug or alcohol treatment and that if he was not depressed, he would not use alcohol or drugs. Plaintiff was assessed with major depressive disorder, severe, recurrent episode; a panic

disorder; and posttraumatic stress disorder with dissociative symptoms and derealization. It was recommended that Plaintiff attend therapy and receive medication management.

On October 3, 2016, Plaintiff was seen at the Schmitz Family Practice for a depression follow-up. (Tr. 418-421). Plaintiff reported he got frustrated and angry easily. Plaintiff also reported problems with erectile dysfunction and crying spells. After examining Plaintiff, Dr. Schmitz assessed Plaintiff with depression, an anxiety disorder and erectile dysfunction. Plaintiff was prescribed medication and instructed to continue counseling.

On October 12, 2016, Plaintiff was seen by Dr. Regina E. Thurman for pain management. (Tr. 530-533). Upon examination, Dr. Thurman noted Plaintiff had normal range of motion of the cervical spine but globally restricted range of motion of the lumbar spine. Plaintiff had a normal range of motion without pain in the upper extremities and left lower extremity. Plaintiff exhibited a restricted range of motion in the right lower extremity. Plaintiff exhibited normal strength and tone in all extremities. Plaintiff had normal attention and concentration. Plaintiff was noted to have a normal gait and to stand without difficulty. Plaintiff was assessed with chronic pain and hip pain and prescribed medication. Plaintiff was also prescribed a back brace for weak core muscles and referred for a lumbar MRI.

On October 19, 2016, Plaintiff presented to Mercy Hospital Fort Smith complaining of right leg pain. (Tr. 505-513, 577-585). Dr. Johnson noted Plaintiff had a history of removal of hardware but continued with lateral hip pain and bursitis. After examining Plaintiff, Dr. Johnson assessed Plaintiff with right leg/hip pain, recurrent greater trochanteric bursitis, scarring IT band. Dr. Johnson noted Plaintiff elected to undergo right iliotibial band lengthening.

On November 3, 2016, Plaintiff was seen by Dr. Johnson for a follow-up for his right hip. (Tr. 518-519). Plaintiff reported that overall he was doing well and that his pain had improved. Plaintiff reported he was taking some pain medication. Upon examination, Dr. Johnson noted Plaintiff had minimal tenderness to palpation about the greater trochanter but no pain with internal or external rotation of the hip. Dr. Johnson recommended Plaintiff resume IT band stretching. Plaintiff was to return in four weeks.

On November 9, 2016, Plaintiff was seen by Dr. Thurman for right and left hip pain. (Tr. 534-537). Plaintiff reported the pain medications were working well overall. Plaintiff continued to wear his back brace for comfort. Plaintiff indicated that his medications allowed him to perform his activities of daily living. Dr. Thurman noted Plaintiff would be starting physical therapy in December. Plaintiff was to continue his medications. Dr. Thurman also re-referred Plaintiff for a MRI.

On December 1, 2016, Plaintiff was seen by Dr. Johnson for his right elbow pain. (Tr. 520-522). Dr. Johnson noted Plaintiff had a history of left shoulder arthroscopy, as well as, IT band lengthening of the right hip. Plaintiff reported both were stable and improved. Plaintiff reported minimal pain and that he continued to work on stretching. Plaintiff indicated that weight loss had helped his lumbar spine. With respect to Plaintiff's hip, Dr. Johnson noted Plaintiff was doing well and had responded well to surgical intervention. With respect to Plaintiff's elbow, Dr. Johnson noted Plaintiff had a benign tumor of his right elbow soft tissue that had the consistency of an inclusion cyst. Plaintiff elected to have the cyst excised. Plaintiff was also given a prescription for pain medication.

On December 7, 2016, Plaintiff was seen by Dr. Thurman for lower back and right hip pain. (Tr. 538-541). Plaintiff reported he was not doing well. Plaintiff indicated he had

more pain with the cold weather.  Dr. Thurman increased the number of pain pills to help with the pain.

On December 9, 2016, Plaintiff underwent a MRI of the lumbar spine that revealed degenerative disc disease at L3-4-5 level with mild canal stenosis.  (Tr. 545).

On December 12, 2016, Plaintiff was seen by Dr. Johnson to undergo the excision of his right elbow cyst.  (Tr. 551-560, 586-595, 689-691, 720-723, 725).  Prior to the procedure, Dr. Johnson noted tenderness of the right elbow.  Plaintiff tolerated the procedure without complications.

On December 27, 2016, Plaintiff was seen at the Schmitz Family Practice for suture removal.  (Tr. 603-605).  Dr. Schmitz noted Plaintiff had a fatty tumor removed one month ago by Dr. Johnson.  Plaintiff was noted to have a gait within normal limits.  Plaintiff also had an intact memory and normal judgment, insight and mood.  Plaintiff was assessed with hypertension and hyperlipidemia.

On January 15, 2017, Plaintiff was admitted into Valley Behavioral Health System due to suicidal ideation.  (Tr. 613-624).  Plaintiff reported he lived with his girlfriend. Plaintiff reported that he planned to hang himself and that his doctor told him to seek admission so that he could get his medication adjusted.  Plaintiff responded well to his medication regimen and the therapeutic milieu.  Plaintiff was noted as improved and stable upon discharge on January 20th.

On January 30, 2017, Plaintiff was seen at the Schmitz Family Practice for a sinus infection.  (Tr. 600-602).  Upon examination, Dr. Schmitz noted Plaintiff was ill-appearing. Plaintiff was noted to have a gait within normal limits.  Plaintiff also had an intact memory

and normal judgment, insight and mood.  Plaintiff was assessed with acute sinusitis, sinus congestion and fever.  Plaintiff was started on an antibiotic.

On February 6, 2017, Plaintiff was seen by Dr. Thurman for lower back and right hip pain.  (Tr. 640-643).  Plaintiff reported he was doing okay.  Plaintiff reported he had taken extra medication after he split wood.  Plaintiff reported that the medication helped his pain. Dr. Thurman noted Plaintiff was stable. Plaintiff indicated that he had seen a chiropractor and it had helped with his pain.  Upon examination, Dr. Thurman noted Plaintiff had a normal range of motion in all extremities with the exception of Plaintiff's lumbar spine and right lower extremity where he had a restricted range of motion.  Plaintiff has found to have normal strength and tone.  Plaintiff exhibited a normal gait and the ability to stand without difficulty.

On February 17, 2017, Dr. Dan Gardner, a non-examining medical consultant, completed a RFC assessment opining that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds; could stand and/or walk for a total of six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; could occasionally stoop and crouch; could occasionally overhead reach with the left upper extremity; and that visual, communicative and environmental limitations were not evident.  (Tr. 66-68).  On June 19, 2017, after reviewing the records, Dr. Jim Takach affirmed Dr. Gardner's opinion. (Tr. 106-108).

On February 22, 2017, Plaintiff was seen at Western Arkansas Counseling and Guidance Center for a psychiatric assessment.  (Tr. 626-630).  Alice Slavens, APRN noted this was her first visit with Plaintiff.  Plaintiff reported he had experienced depression and

suicidal thoughts for six years. Plaintiff believed his son took some of his medication. Plaintiff reported he quit using cigarettes three weeks ago but had started vaping. Plaintiff reported he drank about a six-pack of beer a week and had used marijuana and methamphetamine about two weeks ago. Plaintiff reported that he lived with his girlfriend or by himself and his grandson. He reported that he did handyman work when he was able but had filed for disability due to his back and right hip injuries. Plaintiff reported over the past two weeks his mood had been "pretty good, pretty fair." After evaluating Plaintiff, Nurse Slavens assessed Plaintiff with major depressive disorder, severe, recurrent; panic disorder; and posttraumatic stress disorder, with dissociative symptoms, derealization. Plaintiff was prescribed medication and therapy.

On March 23, 2017, Plaintiff was seen by Dr. Terry L. Efird for a mental diagnostic evaluation. (Tr. 649-653). Plaintiff reported he had applied for disability secondary to "PTSD, suicidal depression, high anxiety, and psychotic." Plaintiff reported his medication had been somewhat beneficial. Plaintiff reported he lived with his mother and grandson. Dr. Efird noted Plaintiff endorsed the ability to perform basic self-care tasks and to perform household chores most of the time. Plaintiff reported he had primarily worked in construction and last worked full-time over one year ago at a turkey plant. Plaintiff reported he left that job after working a couple of months via mutual agreement. Plaintiff reported having a six-pack of beer twice per week. Dr. Efird assessed Plaintiff with major depressive disorder, moderate to severe, with suicidal traits reported; PTSD; and alcohol abuse/dependence, reportedly in remission for about six months.

With respect to adaptive functioning, Dr. Efird noted Plaintiff was able to drive unfamiliar routes; to shop independently; to handle personal finances adequately; to perform

most activities of daily living adequately "most of the time"; and to interact with his girlfriend of a year on a daily basis. Dr. Efird opined Plaintiff had the capacity to perform basic cognitive tasks required for basic work-like activities and the ability to track and respond adequately. Dr. Efird opined Plaintiff completed most tasks within an adequate time frame.

On March 27, 2017, Dr. Michael Hazelwood, a non-examining medical consultant, completed a Mental RFC Assessment opining that Plaintiff was moderately limited in some areas of functioning. (Tr. 68-71). On the same date, Dr. Hazelwood completed a Psychiatric Review Technique form opining that Plaintiff had mild difficulties with understanding, remembering and applying information; moderate difficulties interacting with others; moderate difficulties in maintaining concentration, persistence and pace; and mild difficulties with adapting and managing oneself. (Tr. 64-65). On June 15, 2017, after reviewing the records, Dr. Diane Kogut affirmed Dr. Hazelwood's opinion. (Tr. 108-110).

On March 28, 2017, Plaintiff was seen by Dr. Thurman for his middle and lower back pain. (Tr. 644-646). Plaintiff reported his medications were working well. Plaintiff reported he had been seeing a chiropractor and that had helped with his back pain but not his hip pain. Plaintiff reported his medications allowed him to perform his activities of daily living. Upon examination, Dr. Thurman noted Plaintiff exhibited a normal range of motion in his spine and extremities. Plaintiff also had a normal gait and the ability to stand without difficulty. Dr. Thurman noted Plaintiff's urinalysis was positive for illicit drugs so all controlled prescriptions were held. Plaintiff was to return in two months.

On May 8, 2017, Plaintiff was seen in the Schmitz Family Practice for a medication refill and a left knee injury. (Tr. 668-670). Plaintiff reported he was wrestling with a friend

16

and twisted his left knee.  Plaintiff indicated he went to the emergency room where he was told he had torn cartilage and to follow-up with his primary care physician to get a MRI.  Dr. Schmitz noted Plaintiff had pain in the center of his knee and was wearing a knee immobilizer.  Dr. Schmitz assessed Plaintiff with a strain of the knee and referred him to an orthopedic specialist so that he could get a MRI.

On May 25, 2017, Plaintiff was seen by Dr. Johnson for his left knee pain.  (Tr. 692-693).  Dr. Johnson noted Plaintiff reported the injury occurred three weeks ago and that the pain and swelling had gradually improved.  Plaintiff reported he had tried to walk without the brace and experienced buckling episodes.  Dr. Johnson assessed Plaintiff with a left knee ACL sprain.  Dr. Johnson recommended rehabilitation and a MRI.  Plaintiff was instructed to avoid any playing or twisting type of activity.

On June 12, 2017, Plaintiff was seen by Dr. Johnson for his left knee pain.  (Tr. 694-695, 728-738).  Plaintiff reported he continued to have a mild degree of instability of the left knee with frequent giving out and buckling.  Plaintiff reported he had crutches that he used occasionally.  Dr. Johnson noted Plaintiff's MRI revealed an ACL tear of his left knee. Dr. Johnson performed a left knee arthroscopy with anterior cruciate ligament reconstruction

On June 27, 2017, Plaintiff was seen by Dr. Johnson for his left knee.  (Tr. 699-701).  Dr. Johnson noted Plaintiff was two weeks status post a left knee arthroscopy with anterior cruciate ligament reconstruction.  Plaintiff reported improvement with his pain and swelling.  Plaintiff reported he fell on his right knee but did not injure his left knee.  After examining Plaintiff, Dr. Johnson recommended continued crutch use and referred Plaintiff for physical therapy.

On July 27, 2017, Plaintiff was seen by Dr. Johnson for a left knee follow-up appointment. (Tr. 702-704). Plaintiff reported his knee was doing well. Plaintiff denied any instability and indicated his range of motion and strength were improving. Upon examination, Dr. Johnson noted no pain with range of motion. Plaintiff was to attend physical therapy and refrain from pivoting or twisting.

On August 4, 2017, Plaintiff was seen in the Schmitz Family Practice for a follow-up for his depression and a medication refill. (Tr. 671-673). Dr. Schmitz noted Plaintiff's depression was stable with his current medications. Plaintiff reported that he needed his blood pressure medication but had stopped the Lipitor as he was trying to watch his diet. Upon examination, Dr. Schmitz noted Plaintiff was well-appearing with a normal gait and no focal deficits. Plaintiff was assessed with depression, unspecified essential hypertension and hyperlipidemia.

On September 28, 2017, Plaintiff was seen by Dr. Johnson for a follow-up for his left knee. (Tr. 705-707). Plaintiff reported he had done very well after surgery but two weeks ago stepped out of his truck and sustained a twisting injury. Dr. Johnson referred Plaintiff for a MRI of the left knee.

On October 4, 2017, Plaintiff was seen in the Schmitz Family Practice for a hypertension/hyperlipidemia follow-up. (Tr. 674-676). Plaintiff reported he had not checked his blood pressure every day. Plaintiff reported he needed a referral to pain management. Plaintiff also reported that he fell out of his truck two weeks ago and twisted his knee. Dr. Schmitz assessed Plaintiff with chronic pain, hyperlipidemia and bipolar disorder.

On October 19, 2017, Plaintiff was seen by Dr. Johnson for a follow-up for his left knee. (Tr. 708-710). Plaintiff reported continued pain and recurrent swelling in his left knee.

18

Plaintiff requested a refill of his pain medication. Dr. Johnson noted that a MRI revealed a posterior horn medial meniscus tear. Dr. Johnson discussed treatment options and noted Plaintiff elected to proceed with surgical intervention.

On November 1, 2017, Plaintiff was seen in the Schmitz Family Practice for a hyperlipidemia follow-up. (Tr. 677-679). Dr. Schmitz examined Plaintiff and then recommended he continue with his current medications.

On November 8, 2017, Plaintiff underwent a left knee arthroscopy, partial medial meniscectomy performed by Dr. Johnson. (Tr. 744-745).

On November 28, 2017, Plaintiff was seen by Dr. Johnson for a left knee follow-up. (Tr. 714-716). Plaintiff was two weeks status post knee arthroscopy with partial medial meniscectomy. Plaintiff reported the pain and swelling were improving. After examining Plaintiff, Dr. Johnson recommended a quad strengthening program. Plaintiff was given a refill of pain medication.

On December 29, 2017, Plaintiff was seen by Dr. Johnson for his left knee. (Tr. 717-719, 724). Plaintiff reported he had resumed rehab and was working on strengthening and range of motion. Plaintiff reported he still experienced some pain in his knee. Plaintiff indicated that he continued to use pain medication and requested a refill. After examining Plaintiff, Dr. Johnson recommended continued quadriceps strengthening and range of motion with closed chain exercises for the left knee. Plaintiff was to return in five months.

## III.   Applicable Law:

The Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole." Combs v. Berryhill, 878 F.3d

642, 645-46 (8th Cir. 2017). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." Id. The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." Id. The Court will not reverse an administrative decision simply because some evidence may support the opposite conclusion. Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. Id.

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s)

prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

**IV.    Discussion:**

Plaintiff argues the following issue on appeal: 1) the ALJ erred in failing to fully and fairly develop the record; 2) the ALJ erred at Step Two of the sequential analysis by excluding Plaintiff's right hip as a medically determinable impairment requiring consideration in the remainder of the sequential evaluation; 3) the ALJ erred in his residual functional capacity determination which was not supported by either examining or treating source opinion evidence; and 4) the ALJ erred in failing to adjudicate a potential closed period.

**A.    Insured Status:**

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. 42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on December 31, 2017. Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of July 26, 2015, his alleged onset date of disability, through December 31, 2017, the last date he was in insured status under Title II of the Act.

21

In order for Plaintiff to qualify for DIB, he must prove that on or before the expiration of his insured status he was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death.  Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984).

With respect to Plaintiff's SSI application, benefits are not payable prior to the date of application, regardless of how far back disability may, in fact, be alleged or found to extend. See 20 C.F.R. § 416.335.  Therefore, the relevant period is from August 25, 2016, the date Plaintiff protectively applied for SSI benefits, through May 14, 2018, the date of the ALJ's decision.

**B.     Full and Fair Development of the Record:**

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir.1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).  After reviewing the entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities during the relevant time period.  Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

**B.      Plaintiff's Impairments:**

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C .F.R. § 404.1520(c).  While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted).  To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p.  The claimant has the burden of proof of showing he suffers from a medically-severe impairment at Step Two.   See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir.2000).

While the ALJ did not find all of Plaintiff's alleged impairments to be severe impairments, the ALJ specifically discussed the alleged impairments in the decision, and clearly stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe.  See Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir.2006) (where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC based on all alleged impairments, any error in failing to identify particular impairment as "severe" at step two is harmless); Elmore v. Astrue, 2012 WL 1085487 *12 (E.D. Mo. March 5, 2012); see also 20 C.F.R. § 416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments ..., including ... impairments that are not 'severe' "); § 416.923 (ALJ must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").  After reviewing the record as a whole, the Court finds the ALJ did not commit reversible error in setting forth Plaintiff's severe impairments during the relevant time period.

### C.    Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.   A review of the record revealed that in March of 2017, Plaintiff indicated he was able to drive unfamiliar routes, to shop independently; to handle personal finances adequately; to perform most activities of daily living adequately "most of the time; and to interact with his girlfriend of a year on a daily basis.  The record revealed in February of 2017, Plaintiff was able to split wood and in May of 2017, he felt well enough to wrestle with a friend.

With respect to Plaintiff's alleged impairments, both physical and mental, the record revealed that Plaintiff responded well to treatment. Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009)(impairments that are controllable or amenable to treatment do not support a finding of disability).  Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity.

Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### D.    RFC Determination:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In determining that Plaintiff maintained the RFC to perform light work with limitations, the ALJ considered the medical assessments of the non-examining agency medical consultants; Plaintiff's subjective complaints; and his medical records.  Plaintiff's capacity to perform this level of work is supported by the fact that Plaintiff's examining physicians placed no restrictions on his activities that would preclude performing the RFC determined during the relevant time period.  See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability).

After reviewing the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

### E.    Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a can-filling closing machine tender, a power screwdriver operator, and a compression molding machine tender during the time period in question. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### F.    Closed Period of Disability:

The Commissioner may award Social Security disability benefits either on a continuing basis or, where a once-disabling condition later ceases to be disabling, for a "closed period." Harris v. Sec'y of Dep't. of Health & Human Servs., 959 F.2d 723, 724 (8th Cir. 1992). However, to qualify for a closed period of disability, the disabling condition must last for at least twelve months. 42 U.S.C.423(d)(1)(A); Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006). As stated above, the ALJ determined Plaintiff maintained the RFC to perform light work with limitations during the time period in question. As previously discussed, the Court found substantial evidence to support this RFC determination. The ALJ

was not required to present a rationale for not awarding a closed period of disability when he determined Plaintiff has no disabling condition.  See SSR 82-52.  There is no basis to find Plaintiff is entitled to a closed period of disability which lasted at least twelve months.

**V.     Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 19th day of  February 2020.

/s/  *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE